IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA

CHRISTEN LANE,

    Plaintiff,

v.

LIFT 1428, LLC,

    Defendant.

Case No.: 1:16-cv-00087-TRM-SKL

## REPLY TO RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Lift 1428, LLC ("Lift") moved this Court for summary judgment in accordance with Fed. R. Civ. P. 56, because the undisputed facts demonstrate that Lift is entitled to judgment as a matter of law. Lane has now filed her Response,[1] and attempts to defeat summary judgment by mischaracterizing the facts, citing record materials that do not support the statements being made, and offering her subjective beliefs. Lane's Response ultimately does not demonstrate a genuine issue for trial on her sole claim – pregnancy discrimination under the Tennessee Human Rights Act ("THRA"). Lift's Motion therefore should be granted.

**A.    Lane's "Statement of Facts" is fraught with issues and ultimately does not create a genuine issue for trial.**

Lane may defeat Lift's Motion only by submitting significant probative evidence to support her claims, thereby demonstrating that there are disputes as to material facts such that there remains a genuine issue for trial.[2] Here, Lane presents a self-titled "Statement of Facts" that comprises immaterial and extraneous facts, conclusory allegations of disparate treatment or wrongdoing, legal conclusions couched as facts, assertions that bear no citation to the record, citations to materials that do not support the statements being made, and her subjective belief that she has been wronged. A few examples of Lane's "facts" are illustrative:

- "Although Lift was not making the sales the founder and CEO hoped, that had nothing to do with Plaintiff's performance."[3] (conclusory allegation; no citation).

---

[1] See Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") [Court File No. 39], Page ID #301.
[2] See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
[3] See Pl.'s Resp. [Court File No. 39], Page ID# 303.

1

16714_00/1501/CK2-3116935_4

- "Lift's marketing strategy (originally established by David McDonald in 2014), and the products it offered to prospective customers, were in a state of flux in the spring of 2015." (belief; immaterial fact; no citation).[4]

- "Lift's new focus on 'branded content' also meant there would be a much lower price point than a full-fledged custom magazine."[5] (immaterial fact).

- "…in March 2015, Plaintiff closed the largest sale in the company's history … to Erlanger Health Systems."[6] (cited material does not support this statement).

- "Emails between David McDonald and Plaintiff show that Plaintiff was intimately involved in the negotiation process, communications with the customer, and that Plaintiff prepared the agreement presented to Erlanger."[7] (cited material does not support this statement).

- "David McDonald did not report [the pregnancy news] to anyone else, but he told Plaintiff to speak with Diane McDonald regarding how it would affect Plaintiff's work schedule."[8] (no citation; contradicted by David's testimony).

- "Plaintiff was also placed under increased scrutiny after her pregnancy announcement."[9] (subjective belief; conclusory allegation; no citation).

- "[A]t the time of Plaintiff's termination, she and Thomas had identical job descriptions and standards."[10] (no citation).

- "[Plaintiff] had only nineteen days to work under her performance plan before being terminated, with no chance to succeed."[11] (subjective belief; cited material does not support this statement; conclusory allegation).

Lane also proffers distorted facts, some illustrative examples of which include:

- Lane cites to David McDonald's deposition testimony to support her statement that "[Lift] made Plaintiff the point person for securing the [Erlanger] sale."[12]

    - In actuality, David testified as follows:

        Q: Ms. Lane secured business with Erlanger Health Systems late March – or late February, early March, while she was with Lift. Is that correct?

        A: No.

        Q: Okay. Let's look at the first page – well, what do you mean, no?

        A: She took care of the administrative work for a piece of business that we had contemplated bringing in but we found we could not bring in because we had a competitive issue with another client – mutual respect – so we had to decline the business.

---

[4] Id.
[5] Id.
[6] Id. at Page ID# 303-304.
[7] Id. at Page ID# 304.
[8] Id. at Page ID# 305.
[9] Id. at Page ID# 306.
[10] Id.
[11] Id. at Page ID# 309.
[12] Id. at Page ID# 304.

2

16714_00/1501/CK2-3116935_4
Case 1:16-cv-00087-TRM-SKL   Document 41   Filed 10/09/17   Page 2 of 11   PageID #: 419

> Q: Okay. When you say she did the administrative work aspects, what do you mean?
>
> A: I found the prospect, met the prospect first, discerned what the opportunity was, understood the current state and future state and the value gap, provided insights around how to fill the value gap vis-a-vis a community health magazine and then passed it off to Christen as what I would consider[] to be a form of exercise, which was a good form for exercise for her because she did do a good job, you know, going back to the client after I brought them in, if you will, and securing the business, so to speak, and from an administrative point of view and becoming the point person. And I was even going to give her the credit for the sale, because I was just trying to be a nice guy.[13]

- Lane claims that "[Chasen] Thomas' July 2015 pipeline report show[ed] zero closed sales, so he had not out performed Plaintiff since being placed on the performance improvement plans."[14]
    - But Thomas's July 2015 pipeline report showed improvement over previous months, and Thomas had seven prospects and had closed two sales.[15]
- "Mr. Thomas' history at Lift was marked by poor reviews and negative feedback."[16]
    - This statement was unsupported by a citation to the record, and in fact, despite Thomas' relatively few sales, David characterized his work as "impressive":

        > Q: What was [Thomas'] work product like when he was at Lift?
        >
        > A: Impressive. I mean, the guy …. he's a hard worker….[T]here's this document where he was going to resign, but he wanted to stick around. You know, that's an example of a guy who'd try to solve problems. He would get in his car and drive all over the country and meet hospitals. He would do research and produce research reports about the opinions of…
        >
        > …
        >
        > A: He would do research in the market to determine where opportunity lay and things of that nature. He was just a – he was a curious guy.[17]

In this regard, Lane has attempted to obfuscate the issues in the hope that this Court will rule in her favor. But the law is abundantly clear that "conclusory statements unadorned with supporting

---

[13] See Pl.'s Suppl. Index [Court File No. 40], Page ID# 335-36.
[14] See Pl.'s Resp. [Court File No. 39], Page ID# 310.
[15] See App. to Def. Mot. [Court File No. 36], Page ID# 285-86.
[16] See Pl.'s Resp. [Court File No. 39], Page ID# 306.
[17] Dep. of David McDonald ("David Dep."), 164:1-18, Def.'s Supp. App. p. 252.

3

facts are insufficient to establish a factual dispute that will defeat summary judgment."[18] It likewise is well settled that "rumors, conclusory allegations[,] and subjective beliefs are wholly insufficient to establish a claim of discrimination as a matter of law."[19] Because Lane bases her arguments on nothing more, she simply has failed to create a disputed issue for trial.

**B.       The motivating factor standard does not apply to THRA claims.**

Lane's Response, although a bit muddled, seems to argue that her case should be analyzed under the single-motive and mixed-motive theories applicable to Title VII.[20] Of course, Lane has not asserted a Title VII claim, and in fact, her only claim is under the THRA, which does not recognize mixed-motive claims.

Title VII prohibits discrimination "because of such individual's race, color, religion, sex, or national origin."[21] In Price Waterhouse v. Hopkins,[22] a plurality of the Supreme Court concluded that, if an employee shows that an impermissible consideration, *e.g.*, pregnancy, played a role in the employer's adverse employment action, the burden of persuasion shifts to the employer to prove that it would have made the same decision in the absence of the impermissible consideration.[23] If the employer meets that burden, it is relieved of liability.[24]

Congress then amended Title VII to codify the motivating factor standard: "an unlawful employment practice is established when the complaining party demonstrates that race, color, religions, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."[25] But, significantly, the THRA was not similarly amended. The THRA instead continues to prohibit discrimination "because of" sex, as

---

[18] Espey v. Spectrum Health Sys., Inc., No. 1:09-cv-0090, 2011 WL 2516638, at *11 (M.D. Tenn. June 23, 2011) R. & R. adopted sub nom. Espey v. Tolley, No. 1:09-cv-0090, 2011 WL 2946709 (M.D. Tenn. July 20, 2011) (Trauger, J.) (quotations omitted)).
[19] Whitaker v. Tenn. Valley Auth. Bd. of Directors, No. 3:08-cv-1225, 2010 WL 1493899, at *7 (M.D. Tenn. Apr. 14, 2010) (quotations omitted).
[20] See Pl.'s Resp. [Court File No. 39], Page ID# 301, 310-11.
[21] 42 U.S.C. § 2000e-2(a)(1).
[22] 490 U.S. 228 (1989).
[23] Id.
[24] Id.
[25] 42 U.S.C. § 2000e-2(m) (emphasis added).

4

it has since it was passed.[26] Because the THRA prohibits discrimination "because of" sex and does not require a motivating factor standard, mixed-motive claims are not cognizable under the THRA. And thus Lane's claim must be analyzed under a single-motive theory, and is subject to the "but for" causation standard.[27]

In any event, even under a lesser standard, Lane has still not proven her *prima facie* case, as the evidence shows Lane's pregnancy was not even a motivating factor in Lift's decision to terminate her employment. Rather Lift terminated Lane's employment because she failed to make a single sale or to generate promising leads.[28]

**C. Lane has not created a genuine issue for trial as to whether she can prove a *prima facie* case of discrimination.**

**1. Lane failed to couple temporal proximity with other evidence of discriminatory conduct to establish causation.**

Despite Lane's assertions otherwise, Lift is not attempting to "craft a two-month cut off" for establishing temporal proximity.[29] Lift instead simply points out that the Sixth Circuit and this Court have repeatedly recognized that "very close" temporal proximity is roughly two months or less.[30] And that, without "very close" temporal proximity between the adverse action and the protected activity, the plaintiff must present other evidence of retaliatory conduct.[31]

Lift terminated Lane's employment 70 days, or almost 2.5 months,[32] after her pregnancy announcement.[33] Under Sixth Circuit law, this does not qualify as "very close" temporal proximity, meaning that Lane must present other evidence of retaliatory conduct, which she did

---

[26] Tenn. Code Ann. § 4-21-401.
[27] See Mem. of Law Supp. Lift's Summ. J. Mot. ("Def. Mem. of Law") [Court File No. 35], Page ID# 130.
[28] See Def. Mem. of Law [Court File No. 35], Page ID# 120-42.
[29] See Pl.'s Resp. [Court File No. 39], Page ID# 315.
[30] See, e.g., Kean v. IT-Works, Inc., 466 F. App'x 468, 471 (6th Cir. 2012); Parks v. Metro. Sec. Servs., Inc., Case No. 1:13-cv-412 (E.D. Tenn. Jan. 29, 2016), aff'd on other grounds, Parks v. Metro. Sec. Servs., Inc., No. 16-5217 (6th Cir. Feb. 28, 2017); Atkins v. Denso Mfg. Tennessee, Inc., No. 3:09-CV-520, U.S. Dist. LEXIS 121518 (E.D. Tenn. Oct. 20, 2011) (collecting cases).
[31] Evans v. Walgreen Co., 813 F. Supp. 2d 896, 926 (W.D. Tenn. 2011).
[32] Lane's Response states it was 68 days from Lane's pregnancy until her termination. This is an improper calculation. Lane herself admits in her Statement of Facts that she informed David she was pregnant on May 11, which was 70 days before her discharge.
[33] See App. to Def. Mot. [Court File No. 36], Page ID# 177, 205.

5

not do.[34] Lift will not repeat its argument on this point stated in its Memorandum of Law at pages 19-21.[35] But the key takeaway is that Lane's *only actual evidence* of causation is the 70-day temporal proximity between her pregnancy announcement and her termination, which is "too long to allow an inference of causation without more proof."[36]

Lane's Response does not recognize this distinction, as shown by her failure to address the concept of "very close" temporal proximity and by her citation to DeBoer v. Musashi Auto Parts, Inc.[37] as support for her argument.[38] The plaintiff in DeBoer was held to have proved her *prima facie* case because **her performance reviews and supervisor's testimony demonstrated she was qualified** and her demotion followed two months after her pregnancy announcement.[39] The DeBoer Court noted that the plaintiff, in addition to showing temporal proximity, had "submitted evidence demonstrating that she was qualified for her job."[40] Lane's case differs greatly, as she cannot produce any additional evidence tending to suggest causation.

Lane's Response also argues that "cases cited by [Lift] are inapposite [on this issue] because they are all retaliation cases."[41] Courts within the Sixth Circuit have held that **"a pregnancy discrimination claim is to be analyzed under the same framework as a retaliation claim**."[42] Lift's reliance on retaliation cases was justified.

2. **Lane improperly relies on the Mitchell factors as dispositive proof that Thomas and Lane were comparators.**

Lane's Response cites the state court case Spann v. Abraham[43] for the principle that "comparable employees should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and

---

[34] See Def. Mem. of Law [Court File No. 35], Page ID# 138-40.
[35] Id.
[36] Ellis, 2012 U.S. Dist. LEXIS at *7. See also Kean, 466 F. App'x at 471.
[37] 124 Fed. App'x 387 (6th Cir. 2005).
[38] See Pl.'s Resp. [Court File No. 39], Page ID # 314.
[39] DeBoer, 124 Fed. App'x at 390-91.
[40] Id.
[41] See Pl.'s Resp. [Court File No. 39], Page ID # 315.
[42] Huck v. Greenspan, No. 06-CV-14562-DT, 2009 U.S. Dist. LEXIS 7739, *38 (E.D. Mich. January 30, 2009) (emphasis added).
[43] 36 S.W.3d 452, 468 (Tenn. Ct. App. 1999) (citing Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992)).

6

requirements."[44] While Lane treats these factors as dispositive, the Sixth Circuit has held that "courts should **not** assume…that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but **should make an independent determination** as to the relevance of a particular aspect of the plaintiff's employment status and that of the non-protected employee."[45]

Attempting to mirror the Mitchell factors, Lane's Response notes "both Thomas and Plaintiff reported to the same manager, participated in weekly meetings with the same manager, submitted the same reports, and both were responsible for generating leads, contacting perspective customers, and closing sales."[46] Lane thus summarily concludes that Thomas was her comparator. But in this oversimplification, Lane disregards the following significant differences:

- Lane had significant sales experiences;[47] Thomas had none.[48]
- Lane was hired for sales;[49] Thomas was hired for marketing,[50] which David distinguishes as two different areas.[51]
- Lane was involved with client meetings and closing sales; Thomas was involved with lead generation.[52]
- Lane made $90,000 plus commission per year;[53] Thomas earned only $60,000 plus commission per year.[54]

Lane and Thomas did of course both report to David. But the Sixth Circuit has "never read the same supervisor criter[ion] as an inflexible requirement."[55] The relevancy of two employees having the same supervisor instead will depend on the facts of each particular case.[56] And in this case, the "same supervisor" criterion is immaterial because Lane and Thomas would have dealt

---

[44] Id.
[45] Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (emphasis added).
[46] See Pl.'s Resp. [Court File No. 39], Page ID# 313.
[47] See Def. Mem. of Law [Court File No. 35], Page ID# 121, § A(1)(a).
[48] LIFT – 901-02, Def.'s Supp. App. pp. 255-256.
[49] See App. to Def. Mot. [Court File No. 36], Page ID# 164-65, 233-35.
[50] David Dep. 66:2-2, Def.'s Supp. App. p. 251.
[51] David Dep. 36:6-25; 37:1-8,D. J.A. pp. 249, 250.
[52] See App. to Def. Mot. [Court File No. 36], Page ID# 175.
[53] Id. at Page ID# 168-69, 292.
[54] Id. at Page ID# 267.
[55] Bobo v. UPS, 665 F.3d 741, 751 (6th Cir. 2012) (internal citation omitted).
[56] Bobo, 665 F.3d at 751 (citing McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005)).

7

with David regardless of their respective job functions or duties because David is CEO of Lift,[57] and was involved with all aspects of Lift's small business.[58] It thus would be inappropriate in this case to rely so heavily on the "same supervisor" criterion without considering other, more meaningful aspects of Lane's and Thomas's employment.

Lane further alleges, without citation, that "there is no doubt that Plaintiff was disciplined more harshly than Thomas."[59] This is patently inaccurate. Both Lane and Thomas had weekly meetings with David to discuss their pipeline reports.[60] Both were asked to record calls to potential clients, and both received feedback on these calls.[61] David held meetings with both where he expressed his unhappiness with their job performances, and where he informed each that they must meet expectations if they wished to keep their jobs.[62] The primary difference is that David terminated Lane before Thomas. But the reason for this is apparent – Thomas had made sales,[63] demonstrated a positive attitude,[64] was a hard worker,[65] and generated leads.[66] Lane, by contrast, had no sales,[67] minimal leads,[68] and exhibited a "lack of curiosity [and] … initiative."[69]

**D.  Lane has not created a genuine issue for trial on the issue of pretext.**

**1.  Lift terminated Lane because Lane failed to make sales or generate prospective customers.**

David McDonald ultimately terminated Lane "for not producing sales."[70] He did not allow her the full three months of the performance improvement plan because "the conversations [they] were having were not indicative of someone who was genuinely interested in learning and

---

[57] See App. to Def. Mot. [Court File No. 36], Page ID# 19.
[58] Id.
[59] See Pl.'s Resp. [Court File No. 39], Page ID# 313.
[60] See App. to Def. Mot. [Court File No. 36], Page ID# 171-72, 282.
[61] Id. at Page ID# 186-88, 203-04.
[62] Id. at Page ID# 189, 203-04.
[63] Id. at Page ID# 286.
[64] Id. at Page ID# 199; David Dep. 167:21-23, Def.'s Supp. App. p. 253.
[65] Id.
[66] Id. at Page ID# 285.
[67] Id. at Page ID# 274-81.
[68] Id.
[69] Id., Page ID# 236.
[70] Id., Page ID# 249.

8

16714_00/1501/CK2-3116935_4

moving forward. And the results that she was generating were abysmal."[71] Granted, David continued to acquire more information about Lane's lack of productivity after her termination, but at the time, David knew one important fact – she was not generating sales and she was not earning her income.[72] And so David terminated her employment.

In an attempt to demonstrate pretext, Lane's Response states that she closed the Erlanger sale.[73] This is a gross mischaracterization of the facts. David generated the lead, met the prospect, and analyzed the deal.[74] He then gave it to Lane to provide her training in administratively closing a deal.[75] Lane did not generate this lead. She did not secure the initial meeting. She did not analyze the deal. Lane simply exchanged emails about signing the Agreement.[76] Lane herself admits that for the sale "to be counted as revenue for the company, it [had to be] a signed contract," which did not occur.[77] Lane did not by any means "secure" the Erlanger deal, and her administrative work on this failed deal does not demonstrate pretext.

2. **Lift's management team did not react inappropriately to Lane's pregnancy announcement.**

Lane's Response attempts to portray Lift's response to Lane's pregnancy as inappropriate and overly personal.[78] Yet Lane took no issue with Diane McDonald's questions concerning her plans, candidly describing it as **"the owner of a small business … trying to plan for her business, frankly, which I understood…"**[79] Besides, "Title VII does not require courts to act as super personnel departments to re-examine an employer's judgment or its management prerogatives and business decisions."[80] Lift's inquiries to Lane were necessary to make business-related decisions in anticipation of Lane's inevitable maternity leave.

---

[71] Id., Page ID# 248-49.
[72] Id. at Page ID# 274-81.
[73] See Pl.'s Resp. [Court File No. 39], Page ID# 317.
[74] See Pl.'s Suppl. Index [Court File No. 40], Page ID # 335-36.
[75] Id.
[76] Id. at Page ID # 410.
[77] See App. to Def. Mot. [Court File No. 36], Page ID # 191-92.
[78] See Pl.'s Resp. [Court File No. 39], Page ID # 305-06.
[79] See App. to Def. Mot. [Court File No. 36], Page ID# 183.
[80] Spann v. Abraham, 36 S.W.3d 452 (Tenn. Ct. App. 1999).

9

**E. It is undisputed that Lane did not mitigate her damages.**

Lane attempts to avoid summary judgment on her claim for damages after November 2015 by claiming that she sought employment after her termination from Lift.[81] But Lane's own deposition testimony clearly belies this point:

> Q: At any point after November 2015 did you get back on the job market and look for employment outside the home?
>
> A: Not specifically, no.
>
> Q: When you say "not specifically," what do you mean?
>
> A: I mean, I would – talk to friends, I would say, you know 'Oh if you hear of anything that has some flexibility, let me know.' But I was not specifically online applying for jobs.[82]

As Lift demonstrated in its Memorandum of Law, this is insufficient to mitigate damages.[83]

**F. Conclusion**

Lane has not presented any disputed issues for trial. She instead has asserted allegations, conclusions, beliefs, and theories couched as "facts" in an attempt to muddy the issues and manufacture disputed material facts. But Lane's efforts are ineffective, and she has not proven any material facts in dispute such that a trial is necessary. Lift's Motion should be granted.

Respectfully submitted,

CHAMBLISS, BAHNER & STOPHEL, P.C.

By: /s/ Justin L. Furrow
Justin L. Furrow, BPR No. 027667
Catherine Karczmarczyk, BPR No. 03380
Liberty Tower, Suite 1700
605 Chestnut Street
Chattanooga, TN 37450
Telephone: 423.756.3000
Facsimile: 423.508.1242
Email:  jfurrow@chamblisslaw.com
ckarczmarczyk@chamblisslaw.com

*Attorneys for Lift 1428, LLC*

---

[81] See Pl.'s Resp. [Court File No. 39], Page ID# 322.
[82] See App. to Def. Mot. [Court File No. 26], Page ID# 213.
[83] See Def. Mem. of Law [Court File No. 35], Page ID# 321-22.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment** was filed electronically with the Clerk of the Court using the CM/ECF system and served via electronic mail by operation of the Court's electronic filing system to the parties listed on the CM/ECF filing receipt.

This 9th day of October, 2017.

                                         CHAMBLISS, BAHNER & STOPHEL, P.C.

                By:   /s/ Justin L. Furrow
                         Justin L. Furrow