UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CHRISTEN LANE, ) | |
| ) | Case No. 1:16-cv-87 |
| *Plaintiff*, ) | |
| ) | Judge Travis R. McDonough |
| v. ) | |
| ) | Magistrate Judge Susan K. Lee |
| LIFT 1428, LLC, ) | |
| ) | |
| *Defendant*. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Lift 1428, LLC's ("Lift") motion for summary judgment. (Doc. 34.) For the reasons stated hereafter, Lift's motion will be **DENIED**.

### I. BACKGROUND[1]

Plaintiff Christen Lane is a former employee of Lift. (Doc. 40, at 19.) Lift is a healthcare consumer-education and marketing company that primarily produces magazines and other materials "intended to educate consumers while simultaneously marketing hospitals." (Doc. 36, at 82.) Lane was employed at Lift as a marketing design strategist, a sales-related position, from January 2015 until her termination in July 2015. (*Id.* at 27, 33; Doc. 40, at 6–7, 19.) In the instant lawsuit, Lane asserts that Lift unlawfully discriminated against her by terminating her because she was pregnant. (Doc. 19.)

---

[1] For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiff Christen Lane. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Background on Lift 1428, LLC

David McDonald is the Chief Executive Officer ("CEO") and founder of Lift. (Doc. 36, at 82.) Prior to founding Lift, McDonald was the founder and former CEO of True North Custom Publishing ("True North"). (*Id.* at 80–81.) True North was a company that created and sold custom marketing content for health care providers. (*Id.* at 5, 80–81.) Lane worked for True North from September 2005 until January 2011, and was a top-performing sales associate there. (*Id.* at 4, 6, 85.) She ultimately resigned from True North due to an increased travel schedule. (*Id.* at 7.) Years later, McDonald also left True North, and decided to start a similar company. (*Id.* at 81–82.)

McDonald and his business partner, Kevin Tugman, founded Lift in October 2012. (*Id.* at 119.) Similar to True North, Lift is a company that sells custom publications to hospitals and health systems. (*Id.* at 22.) However, for the first two years of Lift's existence, it was unable to engage in marketing activities due to McDonald's non-compete agreement with True North. (Doc. 40, at 3–4.) Instead, Lift focused on networking, consulting, and "articulating a value proposition." (*Id.* at 3.) By late 2014, however, McDonald's non-compete agreement had expired and Lift was ready to operate as a marketing company, "with the full intention of going head to head with every marketing company out there, including True North." (*Id.* at 3–4.)

### B. Lane's Position at Lift

Around this time, in late 2014, McDonald contacted Lane to see if she would be interested in coming to work for him at Lift. (Doc. 36, at 17, 38, 86.) After interviewing and visiting the Lift offices, Lane accepted a position. (*Id.* at 21–24.) She began her employment with Lift on January 12, 2015. (*Id.* at 147.) Lane was given the opportunity to choose from three different compensation packages, and she ultimately chose a package comprised of a

$90,000 annual base salary, with 5% commission earned on all sales. (*Id.* at 147.) This made Lane the highest-paid employee at Lift. (*Id.* at 109.) Lane's initial contract also contemplated eight sales in her first year of employment. (*Id.* at 147.) Lane described her job at Lift as "the same thing she had always done [at True North], go out and talk to hospitals and sell content." (*Id.* at 88.) McDonald similarly described Lane's duties as "lead generation, . . . identification of target marketing and sales opportunities, cultivation of prospective customers within the context of those objectives, [and] . . . contacting those customers, basic sales stuff." (Doc. 40, at 9–10.) However, whereas True North was more established, Lift was a "start-up" and the job would be more "grass roots." (Doc. 36, at 22.) In other words, Lane would be generating leads on her own, rather than having a team support her. (*Id.*)

### C. The Sales Team

Lift's sales team primarily consisted of three individuals: (1) McDonald, the CEO; (2) Lane, the market design specialist; and (3) Chasen Thomas, the market strategy specialist.[2] (*Id.* at 120–21.) Lane and Thomas worked together, and both were responsible for generating sales leads. (*Id.*) From the outset of her employment, Lane and Thomas each had a standing sales meeting with McDonald every week. (*Id.* at 26.) These meetings were focused around Lane and Thomas's pipeline reports and sales prospects.[3] (*Id.* at 27.) According to Lane, in her first four or five months at Lift, she "never [saw] anything that [indicated she] was not meeting expectations." (*Id.* at 50.)

---

[2] Although Thomas's job title was "market strategy specialist," his primary focus was to generate sales leads. (Doc. 36, at 121.)

[3] A "pipeline" report is a running list of all current sales opportunities, usually in Excel spreadsheet format. (Doc. 36, at 27.) "Sales opportunities" refers to prospective customers with whom salespersons are in current communication. (*Id.*) A "pipeline" spreadsheet includes information such as hospital names, individual contact names, estimated times for potential deals to close, and the estimated dollar amounts of potential deals. (*Id.*)

3

In contrast, Thomas received negative feedback on several occasions during his tenure at Lift. For instance, on August 29, 2014, McDonald reprimanded Thomas for missing a sales meeting. (Doc. 40, at 39.) In his email to Thomas, McDonald emphasized that "[t]his [was] the second time [Thomas] missed a significant meeting or action deadline and [McDonald] will not be able to tolerate this kind of behavior." (*Id.*) Thomas later committed to close seven new pieces of business between December 3, 2014, and March 31, 2015—a commitment he did not satisfy. (*Id.* at 41.) In March 2015, McDonald criticized Thomas's job performance, giving him until the end of April to achieve certain goals, and requesting that Thomas "do the right thing and submit [his] resignation" if he could not achieve those goals. (*Id.* at 38.) McDonald also accused Thomas of misrepresenting his knowledge of marketing during the hiring process. (*Id.*)

Also in March 2015, McDonald informed Thomas that his new role from that point forward would be to focus only on lead generation, with a goal of setting two new meetings for Lane by the end of 2015. (*Id.* at 85.) According to Lane, McDonald represented to her that he "preferred [Lane] to be the face of the company more in external meetings and that he was not as comfortable with [Thomas] in front of clients." (Doc. 36, at 25.)

### D. Lane's Pregnancy Announcement

In early March of 2015, Lane learned she was pregnant. (*Id.* at 32.) On May 11, 2015, during her weekly sales call with McDonald, she informed him that she was pregnant. (*Id.*) McDonald responded by congratulating Lane and advising her to inform human resources. (*Id.* at 124.) McDonald and Lane only discussed her pregnancy directly on one other occasion.[4] (*Id.*

---

[4] On this occasion, Lane recalls she and McDonald were at the airport when she brought up her pregnancy and McDonald stopped her and informed her that he does not "talk about [pregnancy] often because he [has] several friends who have lost—or have had tough pregnancies." (Doc. 36, at 151.)

4

at 36.) On June 11, 2015, Lane met with Diane McDonald in human resources to discuss what "[the pregnancy] might look like for [Lane's] position moving forward after the baby came—specifically, [Lane's] role in sales, professional and traveling." (*Id.* at 38.) At that point, Lane planned to return to work on a full-time basis after having the baby. (*Id.*)

Lane describes that, despite never having received negative feedback prior to her pregnancy announcement, there "was an entire shift in demeanor and attitude towards [her] after [she] told [her employer] [she] was pregnant." (*Id.* at 54.) According to Lane, this began the afternoon she announced her pregnancy when McDonald asked her to record a sales call, something she had never previously been required to do. (*Id.* at 55–56; Doc. 40, at 57.) Lane asserts that her employer also began "being strict" about having her record her time in Harvest,[5] something else she had never before been required to do, and that she "felt like [she] was being watched." (Doc. 36, at 55–56; Doc. 40, at 49–50.)

On May 12, 2015, the day after Lane's pregnancy announcement, David McDonald emailed Diane McDonald, asking her opinion of Thomas's performance on a joint sales call with Lane. (Doc. 40, at 37.) In the email, McDonald inquired, "[h]ow did [Thomas] do on the opening . . . up to the point where he introduced [Lane]? And how did he do in questioning and interjecting[?]" (*Id.*) Diane McDonald responded, "FAIL. Epic fail. awful. stutter. clumsy. completely awful." (*Id.*) Neither David nor Diane McDonald commented on Lane's performance. (*Id.*) That same day, Lane emailed McDonald proposed follow-up questions based on the recording of the sales call, and he responded, "Good stuff . . . Nice work." (*Id.* at 81.)

---

[5] Harvest is a database Lift used for employees to track their time. (Doc. 40, at 50.)

### E. The Performance-Improvement Plans

On June 24, 2015, Lane and Thomas were placed on identical performance-improvement plans. (Doc. 36, at 58, 103, 113–15, 148–51; Doc. 40, at 20.) The plan gave Lane a sales quota for the third sales quarter of 2015—July, August, and September—to generate $150,000 worth of revenue. (Doc. 36, at 50.) Lane described this quota as "[c]ompletely unattainable." (*Id.*) The plan also altered her compensation structure.[6] Her $90,000 base salary remained unchanged, but she no longer earned 5% commission on all sales. (*Id.* at 150.) Instead, she would only earn commission on sales she generated over $150,000. (*Id.*) This was the first time McDonald had provided this type of negative feedback to Lane. (*Id.* at 100.)

After being on the performance-improvement plan for about three and a half weeks, Lane informed David "that [she] felt pretty confident [about a magazine] opportunity" she had been pursuing. (*Id.* at 61–62.) She had also been working on two other potential opportunities—one with Spartanburg Regional that she believed could close by the end of July, and another with Food City that she discovered herself. (*Id.*) On July 20, 2015, before Lane had an opportunity to satisfy the terms of her performance-improvement plan—nineteen days into the designated three-month time period—she was terminated. (Doc. 40, at 46.) During the phone conversation in which McDonald terminated Lane, he cited her "performance or lack of performance" as the basis for her termination. (Doc. 36, at 63.) Lane described this justification as "ridiculous" because she "had not had time to perform on this job [due to] [t]he shifting of the product [and] the company pivoting so many times in the short six or seven months [she] was there." (*Id.*) Lane also emphasized that the bulk of sales generally occur in the third or fourth quarter, so "[a

---

[6] Although Thomas's plan was the same, it did not alter his compensation structure. He did not previously earn commission on all sales; rather, he only received commission on sales generated over $150,000. (*Id.* at 59.)

6

salesperson] spend[s] the first half of the year building up [their] prospects in [their] pipeline to hopefully close in the third or fourth quarter; and [she] had not even got to the start of being able to see [her] opportunities through to the end." (*Id.* at 63–64.) McDonald similarly described the sales cycle as being an average of ninety days but acknowledged there are some sales that could take up to two years to close. (Doc. 40, at 5.)

According to McDonald, Lane was terminated prior to the three-month time period "for not producing sales" and because he had "a very clear intuition that she was screwing [him] over and not working." (Doc. 36, at 103–04.) McDonald contends that Lane never made a sale. (*Id.* at 102–03.) Lane avers that about a month into her employment, she closed a sale[7] with Erlanger Hospital that Lift canceled due to a conflict with another client. (*Id.* at 45–47.) The parties dispute the extent to which Lane was involved with the Erlanger deal. (Doc. 39, at 3–4; Doc. 41, at 2–3.)

Unlike Lane, Thomas was not terminated on July 20, 2015. (Doc. 40, at 20.) Instead, Thomas was given the opportunity to work all three months in an attempt to satisfy the terms of the performance-improvement plan. (*Id.*) By the end of September, Thomas had not yet met the goals outlined in the performance-improvement plan. (*Id.*) However, Thomas still was not terminated at that point. (*Id.* at 42–43.) He remained employed at Lift until early 2016.[8] (*Id.*)

---

[7] In her deposition, Lane contends that she did "close" this deal because "it was in legal at Erlanger and had already been reviewed by David. So [Plaintiff] had closed it for [her] word." (Doc. 36, at 46.) However, she concedes "[f]or it to be counted as revenue for the company, it had to have a signed contract. And that's when David decided to pull the plug on the opportunity." (*Id.*)

[8] On September 30, 2015, Thomas wrote a letter acknowledging that he did not meet the sales goals set out in his performance-improvement plan. (Doc. 40, at 40.) In that letter, he asked that he remain employed at Lift, but in a modified role. (*Id.*) He then stayed on at Lift until he was ultimately terminated in late 2016, "[b]ecause he wasn't meeting his sales criteria." (*Id.* at 43.)

Lane initiated the instant action in the Circuit Court of Hamilton County, Tennessee, on February 29, 2016. (Doc. 1-5.) This action was removed to this Court on April 11, 2016, pursuant to 28 U.S.C. § 1332.[9] (Doc. 1.) In her amended complaint, Lane alleges Lift unlawfully discriminated against her because she was pregnant and asserts a claim against Lift for violation of the Tennessee Human Rights Act ("THRA"). (Doc. 19.) Lift moves for summary judgment on Lane's claim against it (Doc. 34), and Lift's motion is now ripe for the Court's review.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the

---

[9] This action was removed on the basis of diversity of citizenship. (Doc. 1.) Plaintiff is a citizen and domiciliary of Georgia, and Defendant Lift 1428, LLC, is a limited liability company organized under the laws of Tennessee, with its sole members domiciled in Florida. (*Id.*) Accordingly, diversity of citizenship exists, and jurisdiction is proper in this Court.

allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmovant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

Under the THRA, it is unlawful to "discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment" because of such individual's sex. Tenn. Code Ann. § 4-21-401. The THRA was intended to be coextensive with federal law. *See Thompson v. City of Memphis,* 86 F. App'x 96, 103 (6th Cir. 2004). Thus, the Court's analysis for THRA discrimination claims mirrors that for claims brought under Title VII. *Suits v. The Heil Co.*, 192 F. App'x 399, 400 (6th Cir. 2006). Accordingly, the THRA's prohibition on employment practices that discriminate "because of [an] individual's sex" applies with equal force to employers who discriminate on the basis of pregnancy. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657 (6th Cir. 2000).

To succeed on a THRA discrimination claim, a plaintiff must offer "direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Suits*, 192 F. App'x at 400 (applying the same framework to

plaintiff's THRA and Title VII claims). Lane has offered no direct evidence of pregnancy discrimination.[10] Accordingly, the Court will analyze only whether Lane introduced circumstantial evidence that would allow an inference of discriminatory treatment.

Discrimination claims based on circumstantial evidence follow the established *McDonnell Douglas* burden-shifting framework. *See Suits*, 192 F. App'x at 401. Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff satisfies that burden, the burden then shifts to the employer to "articulate some legitimate, non-discriminatory reason for the employee's rejection." *Id.* If the defendant meets this burden, the plaintiff must then demonstrate that the employer's proffered reason is pretextual. *Id.* at 804.

Lift advances three primary arguments in support of its motion for summary judgment, asserting that: (1) Lane cannot satisfy her burden to demonstrate a nexus between her pregnancy and her termination; (2) Lane cannot satisfy her burden to demonstrate that her termination was a pretext for discrimination; and (3) Lane failed to mitigate her damages after November 15, 2015. (Doc. 35.)

### A. Prima Facie Discrimination

To prevail in a THRA discrimination suit based on circumstantial evidence, the plaintiff must first make a prima facie showing that she was terminated due to her pregnancy. *Suits*, 192 F. App'x at 404. This prima facie requirement is "not onerous" and poses a burden easily met. *Wilkes v. T-Mobile*, No. 1:09-cv-329, 2011 WL 1113397, at *6 (E.D. Tenn. Mar. 24, 2011) (quoting *Cline*, 206 F.3d at 660). To meet her burden, the plaintiff must show that: (1) she was

---

[10] Both Plaintiff and Defendant argue using only the circumstantial discrimination framework. (*See* Docs. 35, 39, 41.)

pregnant; (2) she was subject to an adverse employment action; (3) she was qualified for the position in question; and (4) there is a nexus between her pregnancy and the adverse employment action. *Suits*, 192 F. App'x at 404. For the purposes of this motion, both parties agree the first three elements have been satisfied. (Doc. 35, at 13; Doc. 39, at 12.) Thus, the central dispute is whether a nexus exists between Lane's pregnancy and her termination. To establish a nexus, Lane must show "the adverse action was taken shortly after the Plaintiff's exercise of protected rights," or that her employer treated her "differently from similarly-situated employees." *Payne v. Goodman Mfg. Co., L.P.*, 726 F. Supp. 2d 891, 906 (E.D. Tenn. 2010).

### i. Temporal Proximity

Lift argues that the period of seventy days between when Lane informed Lift of her pregnancy and when she was terminated is too long a period of time to establish a nexus. (Doc. 35, at 14–17.) In response, Lane argues that Lift is attempting to create a "two-month cut off," but the essential question is "whether a jury could find that the timing of Plaintiff's termination is circumstantial evidence of Defendant's discriminatory intent." (Doc. 39, at 15.)

A period of two months or less is generally "sufficient to establish a link between [a plaintiff's] pregnancy and her termination for the purposes of a prima facie case." *E.g.*, *Asmo v. Keane*, 471 F.3d 588, 594 (6th Cir. 2006). However, the Sixth Circuit has never adopted a bright-line "cut-off" after which temporal proximity no longer exists to satisfy the nexus requirement. Instead, the Court focuses on whether the period of time is such that it gives rise to an inference of a "causal connection" between the plaintiff's pregnancy and her termination. *See DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 389 (6th Cir. 2005) (finding the eighty-one days "between DeBoer's announcement of her pregnancy, her filing for FMLA leave, and her demotion" satisfied the nexus requirement); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d

11

555, 563 (6th Cir. 2004) (holding temporal proximity of less than three months was sufficient to give rise to an inference of retaliation).

In this case, seventy days lapsed between Lane notifying her employer of her pregnancy and her termination. (Doc. 40, at 6–7; 19.) Lane also presented evidence that shortly after she announced news of her pregnancy, she was placed on a performance-improvement plan that altered her compensation structure, despite having never previously received negative feedback. (Doc. 36, at 54, 148–51.) This evidence, taken together, is sufficient for a jury to infer a "causal connection" between Lane's pregnancy and her termination.

### ii. *Differing Treatment of Similarly Situated Employees*

Additionally, Lift argues that Lane cannot show she was treated differently than any similarly situated non-protected employee. (Doc. 35, at 17.) Specifically, Lift argues that Chasen Thomas is not an appropriate comparator because: (1) he had significantly less sales experience than Lane; (2) Thomas's pipeline showed more movement than Lane's; (3) they had different sales-related job duties; (4) Thomas made sales, whereas Lane did not; and (5) Lane's salary was higher than Thomas's salary. (*Id.* at 18.) In response, Lane argues that Thomas is an appropriate comparator because he and Lane were both on the sales team and "sales were the primary metric by which [their] performance was evaluated." (Doc. 39, at 6.)

"A plaintiff may establish the connection between her pregnancy and the adverse employment action by demonstrating that comparable nonpregnant employees received more favorable treatment." *Payne*, 726 F. Supp. 2d at 906. A similarly situated employee need not be identical, but must be similar "in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 353 (6th Cir. 1998). Relevant aspects may include whether the employees dealt with the same supervisor, were subject to the same standards, or engaged in the same

conduct without differentiating circumstances that would explain an employer's dissimilar treatment of them. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). However, the Court should examine the circumstances of a particular case to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F.3d at 352.

Thomas and Lane were two members of the three-person sales team. (Doc. 36, at 120–21.) And, although they had different job titles, base salaries and levels of sales experience, they both worked directly with—and reported to—David McDonald. (*Id.* at 137.) They often worked together, as demonstrated by the sales call McDonald asked them to record on May 11, 2015. (Doc. 40, at 37.) They both had a standing weekly meeting with McDonald, and were both required to record calls, conversations, and meetings with prospects in their pipeline reports. (Doc. 36, at 26, 137.) Finally, as relevant to the instant suit, they were both placed on identical performance-improvement plans. (*Id.* at 58, 103, 113–15, 148–51; Doc. 40, at 20.) Although not identical, a jury could find that Lane and Thomas were similar in "all relevant aspects." *Ercegovich*, 154 F.3d at 353.

Although Thomas and Lane were similarly situated, Lane was terminated only nineteen days into her performance-improvement plan. (Doc. 40, at 46.) In contrast, Thomas was given the full three months to try and satisfy the terms of the plan. (*Id.* at 20.) Moreover, when Thomas did not satisfy the plan, he still was not terminated. (*Id.*) These facts are sufficient for a jury to find that Lane was treated differently than Thomas. Recognizing that the burden of establishing a prima facie case is not an onerous one, and viewing the facts in the light most favorable to the plaintiff, there is sufficient proof from which a jury could find a causal nexus between Lane's pregnancy and her termination.

### B. Pretextual Discrimination

#### i. *Legitimate, Non-Discriminatory Basis for Termination*

Because a jury could find that Plaintiff has established a prima facie case of pregnancy discrimination, the burden of production now shifts to Lift to produce a legitimate, non-discriminatory reason for the employment action. *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 646–47 (6th Cir. 1998). However, the burden of persuasion remains with Plaintiff. *Id.* at 647. Legitimate reasons may include seeking a candidate with skills better suited to the job, *id.*, reduction in workforce, *Payne*, 726 F. Supp. 2d at 901, or poor job performance, *id*.

Lift asserts that Lane was terminated because she was not making sales. (Doc. 36, at 103–04.) Lane's inadequate job performance qualifies as a sufficient legitimate non-discriminatory reason under the THRA.[11] Thus, the burden shifts back to Lane to show that this asserted reason is a pretext for discrimination.

#### ii. *Evidence of Pretext*

To overcome the legitimate, non-discriminatory reason proffered by Lift, Lane must show that it is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. Lane can demonstrate pretext by showing that: (1) Lift's reason has no basis in fact; (2) the proffered reason did not actually motivate Lift's termination of Lane; or (3) the reason was insufficient to motivate Lift's termination of Lane. *Frizzell*, 154 F.3d at 647. The third method generally "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Madden v. Chattanooga City Wide*

---

[11] Lane asserts that Lift's proffered reason for her termination is false because she did in fact make sales. (Doc. 39, at 16–17.) However, she does not dispute that "not making sales" is a legitimate non-discriminatory reason for termination under the THRA. (*See id.*)

*Serv. Dep't,* 549 F.3d 666, 676 (6th Cir. 2008) (subsuming THRA analysis into Title VII analysis). If Lane does "produce[] evidence rebutting [Lift's] stated reason, then the factfinder is permitted to infer discrimination and summary judgment in favor of [Lift] is inappropriate." *Frizzell*, 154 F.3d at 647.

Lane has already produced evidence sufficient for a jury to find that she was treated differently than Thomas, a similarly situated non-protected employee. Therefore, she has also introduced evidence to satisfy the third method of showing pretext—that Lift's proffered reason for her termination was insufficient to motivate Lift's termination of Lane. That Lift allowed Thomas the full amount of time to satisfy his performance-improvement plan, but fired Lane within only nineteen days, is sufficient evidence for a jury to find Lift's proffered reason is pretextual. Accordingly, the Court will **DENY** Lift's motion for summary judgment on Lane's discrimination claim under the THRA.[12]

### C. Mitigation of Damages

A plaintiff alleging discrimination under the THRA is obligated to mitigate her damages. *Mountjoy v. City of Chattanooga*, No. E2001-02017-COA-R3CV, 2002 WL 707467, at *4 (Tenn. Ct. App. 2002). The burden lies with the defendant to establish that the plaintiff failed to mitigate. *Id.* The defendant must show that there was "suitable and comparable substitute employment" and that the plaintiff did not diligently pursue such employment. *Id.* But if the employer shows the plaintiff made no reasonable attempt to seek employment, it has met its burden. *See, e.g.*, *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998); *Sellers v.*

---

[12] Lane also argues that the Court should assess her claim under a mixed-motive analysis because both legitimate and illegitimate reasons motivated the employer's decision. (*See* Doc. 39, at 11.) Lift responds that the mixed-motive analysis for Title VII claims is inapplicable in the THRA context. (*See* Doc. 41, at 4–5.) Because the Court denies summary judgment under the single-motive analysis, it need not decide this issue.

*Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). A plaintiff is "only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence." *Madden*, 549 F.3d at 680. "[T]he reasonableness of the plaintiff's efforts are evaluated in light of the individual characteristics of the [plaintiff] and the job market." *Id*.

Lift avers that Plaintiff did not actively seek employment after November 2015, "until such point as she was offered a position with a former employer." (Doc. 35, at 24.) Thus, Lift argues it is not required to put forth evidence of "available comparable employment" and that it has met its burden to demonstrate Plaintiff failed to mitigate her damages. (*Id.*) In response, Plaintiff avers that after she resigned from her sales position in October 2015, she "continued to network with friends looking for a job." (Doc. 39, at 22.)

The burden is on Lift to show that Plaintiff made *no reasonable efforts* to seek employment. *Greenway*, 143 F.3d at 54. The following excerpt from Lane's deposition is the only evidence cited by Lift:

> Q. So you terminate the agreement with Pretty in my Pocket in October of 2015. You have your daughter in November of 2015. Correct?
>
> A. Correct.
>
> Q. At any point after November 2015 did you get back on the job market and look for employment outside the home?
>
> A. Not specifically, no.
>
> Q. When you say "not specifically," what do you mean?
>
> A. I mean, I would – talking to friends, I would say, you know: "Oh, if you hear of anything that has some flexibility, let me know." But I was not specifically online applying for jobs. I didn't have time, with a new baby, to be doing that.
>
> Q. Have you done that at any point since you had your daughter?
>
> A. Yes, I have.
>
> Q. Have you accepted employment anywhere?

A. I have.

From this exchange, the Court is unpersuaded that a reasonable jury would conclude Lane made no reasonable efforts to mitigate her damages. *See Galbreath v. Hale Cty., Alabama Comm'n*, No. CV 15-308-CG-N, 2017 WL 3402967, at *12 (S.D. Ala. Aug. 8, 2017) (despite plaintiff's failure to *apply* for any jobs, finding insufficient evidence to conclude plaintiff made no reasonable effort to mitigate where she was not asked about her pre-application efforts). For instance, the Court does not know whether Lane's conversations were with industry-connected friends or how often they occurred. Additionally, it is unclear whether Lane initiated these conversations specifically for the purpose of finding employment or whether these were casual inquiries in the course of unrelated conversation. These are genuine issues of material fact that cannot be resolved at the summary judgment stage. Accordingly, the Court will **DENY** Lift's motion for summary judgment with respect to the mitigation of damages issue.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Lift's motion for summary judgment. (Doc. 34.)

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**